IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ELISE POOLE and JACKIE BUNTGEN, | ) ) ) | Case No. |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| CITY OF LINCOLN, LANCASTER COUNTY, LINCOLN POLICE CHIEF JEFFREY BLIEMEISTER, LANCASTER COUNTY SHERIFF TERRY WAGNER, and OFFICERS JANE OR JOHN DOES, 1-21, in their individual capacities as employees of Lancaster County and/or the City of Lincoln. | ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** |
| Defendants. | | |

Plaintiffs Elise Poole and Jackie Buntgen for their Complaint against Defendants City of Lincoln, Lancaster County, Lincoln Police Chief Jeffrey Bliemeister, Lancaster County Sheriff Terry Wagner, and Jane or John Does, 1-21, states and alleges as follows:

## INTRODUCTION

1.     Plaintiff Elise Poole is a nineteen-year-old resident of Lincoln, Nebraska. Inspired by recent calls for racial justice and police accountability, Ms. Poole participated in peaceful demonstrations in and around the Lincoln metropolitan area on May 30 and May 31, 2020.

2.     On May 31, 2020, Ms. Poole spent the day at a peaceful protest in downtown Lincoln. Ms. Poole was at all times unarmed and peaceful as she marched with her friends. Ms. Poole and her friends cheered, held up signs, and listened to speakers advocate for racial equality.

3.      When Ms. Poole and dozens of other peaceful protestors marched, holding signs and calling for reform, to the area of 12th and H Streets, they were met by a line of approximately 15 law enforcement officers in riot gear. Shortly thereafter, at approximately 10:00 pm, one of the officers shot Ms. Poole with a "rubber bullet gun" at close range, striking her in the face.

4.      Ms. Poole fell to ground; blood rushing from her face. As she reached for her face to determine the extent of her injuries, she felt her nose hanging near her mouth. With the officers still advancing, Ms. Poole relied on her friends to help her up. On the way to the hospital, Ms. Poole kept pressure on her partially-detached nose to keep it attached to her face.

5.      The Kinetic Impact Projectile ("KIP"), often referred to as a "rubber bullet," fired by law enforcement severed Elise's nose from her face. The severity of these injuries required immediate reconstructive surgery. Doctors determined that the bone, cartilage, and internal valve of her nose was completely destroyed.



**Figure 1: Elise's nose, severed from her face, as she awaited emergency surgery.**



**Figure 2: Elise's condition immediately before emergency reconstructive surgery.**

6.     Municipal policymakers have since acknowledged that their use of KIPs, rubber bullets, eXact iMpact Sponge Rounds, and other projectiles on the evening of May 31, 2020 was a response to the "constant verbal barrage" they had endured the night before. Many of the officers who fired these "less-lethal" projectiles at demonstrators did so without any formal training.

7.     Defendants have also acknowledged that law enforcement "needed to do a better job of identifying the non-protestors in the group that were agitators." Instead, weapons — including KIPs, rubber bullets, and eXact iMpact Sponge Rounds — were indiscriminately used on crowds of peaceful protestors because of the actions of a few alleged "agitators."[1]

8.     KIPs, rubber bullets, and eXact iMpact Sponge Rounds can be lethal. One study reveals that 71% of people struck by rubber bullets suffered severe injuries, 15.5% of individuals were permanently disabled, and 3% died from their injuries. Thus, while rubber bullets may be "less lethal" than traditional ammunitions, rubber bullets are far from harmless and are capable of causing severe permanent injuries and death.

9.     The Defendants' response to Ms. Poole's peaceful demonstration violates the U.S. and Nebraska Constitutions, and Ms. Poole has suffered serious and permanent injuries as a result. In the alternative, Ms. Poole alleges negligence and alternative liability on the part of the John Doe Officers and municipal corporations for their roles in causing or contributing to the injuries alleged.

## PARTIES

10.     Plaintiff Elise Poole is a nineteen-year-old teenager residing in Lincoln, Lancaster County, Nebraska.

11.     Plaintiff Jackie Buntgen is Elise Poole's mother. Ms. Buntgen was, at all relevant times, responsible for certain medical costs associated with Ms. Poole's injuries, as set forth below.

---

[1]     http://netnebraska.org/article/news/1225307/sheriff-rioters-took-toll-deputies-promises-more-crowd-control-training

12.     Defendant City of Lincoln is a municipality incorporated in the State of Nebraska which was and is responsible under law for the acts and omissions of its law enforcement officers, agents, and other employees, including those whose conduct is at issue in this lawsuit.

13.     Defendant Jeffrey Bliemeister was, at all times relevant to this action, the chief policymaker for the Lincoln Police Department. He is sued in his individual and official capacities.

14.     Defendant Lancaster County is a municipality incorporated in the State of Nebraska which was and is responsible under law for the acts and omissions of its law enforcement officers, agents, and other employees, including those whose conduct is at issue in this lawsuit..

15.     Defendant Terry Wagner is, and was at all time relevant to this action, the chief policymaker for the Lancaster County Sheriffs' Office. He is sued in his individual and official capacities.

16.     Defendant Officers Jane and John Does 1-21 are employees with or agents of the City of Lincoln and/or Lancaster County who responded to protests on behalf of the City of Lincoln on May 30 through June 5, 2020. The precise number and identity of these defendants is presently unknown to Plaintiffs. At all times relevant herein, each of these Defendants were acting under color of state law and in the scope of their employment.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it involves a federal question under 42 U.S.C. § 1983.

18.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this judicial district and it is where a substantial part of the events giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

### A. Background.

19.    On May 25, 2020, George Floyd, a Black man, was murdered in Minneapolis, Minnesota by the police. Mr. Floyd was accused of a non-violent offense. During his arrest, Mr. Floyd fell to the ground, and was handcuffed and restrained. Minutes later, for no discernible reason, a police officer placed his knee—and the weight of his body—on Mr. Floyd's neck as Mr. Floyd lay pinned to the ground.

20.    For almost nine minutes, the officer pressed his knee into Mr. Floyd's neck as Mr. Floyd struggled to breathe, pleading for mercy. Instead of intervening, other officers held Mr. Floyd's legs or stood by, watching as Mr. Floyd began to die. Among Mr. Floyd's last words were, "Please, please, please, I can't breathe."

21.    Mr. Floyd's death was captured on video and broadcast globally, sparking demonstrations in over 2,000 cities across the country and more around the world.

22.    Groups of demonstrators throughout the country, including in Lincoln, Nebraska, began gathering on a daily and nightly basis to protest the systemic injustices perpetuated against Black people and other people of color.

23.    With limited exceptions, the daily Lincoln protests ("the Protests") were overwhelmingly peaceful. Based on the alleged conduct of a few protesters, however, Defendants responded by indiscriminately using excessive force and aggressive dispersal tactics against protestors.

24.    The Defendants' response to the Protests included the use of "less-lethal" weapons, including, but not limited to, tear gas and other chemical irritants, flash-bang grenades, bean bags, rubber bullets, KIPS, and eXact iMpact Sponge Rounds.

25.    Defendants deployed chemical irritants both by targeting specific protestors and by launching canisters into a crowd, releasing the irritants indiscriminately in every direction.

26.     Defendants also deployed flash-bang grenades at protestors. When these weapons detonate, they generate loud noise and bright light.

27.     In addition, Defendants shot KIPs, bean bags, rubber bullets, and eXact iMpact Sponge Rounds at protestors. Defendants used this weaponry without any formal training or instruction as to its use as an alleged "crowd control" mechanism.

28.     Tear gas can be lethal. Tear gas exposure can severely impact those with asthma and can trigger a fatal asthma attack.  Even when not directly lethal, exposure to tear gas can increase the risk of developing acute respiratory illnesses.

29.     Flash bangs can be lethal. Flash bangs are explosives intended to stun and disorient people with light and sound, and are designed to temporarily blind or deafen people. The use of these weapons can cause serious injuries, like blowing off appendages, or even death. They can also damage eardrums, cause prolonged ear pain, harm the retina, and lead to burns, concussions, and psychological trauma.

30.     Whether tipped with foam or sponge, or filled with a wooden block or metal birdshot, "rubber bullets" can be lethal. The irregular shape of rubber bullets creates unpredictable trajectories, making it nearly impossible to use them to safely target individuals within a crowd.

31.     Pepper balls can be lethal. Pepper balls are plastic balls that break on impact, releasing a chemical irritant intended to incapacitate or stun.

**B.  Elise Poole.**

32.     At all relevant times, Plaintiff Elise Poole was an eighteen-year-old resident of Lincoln, Nebraska. Ms. Poole participated in the Protests beginning Saturday, May 30, 2020.

33.     While participating in the Protests on May 30, 2020, Ms. Poole was exposed to law enforcement weaponry, including pepper spray, deployed by Defendants as a purported method of crowd control.

34.     Concerned for her safety but determined to make her voice heard, Ms. Poole returned to peacefully protest on Sunday, May 31, 2020. Ms. Poole brought with

her first-aid materials to assist others who may be exposed to chemical irritants or other weapons deployed by Defendants.

35.    At approximately 10:03 p.m., Ms. Poole gathered with other peaceful demonstrators at or near the intersections of 12th and H Streets. Ms. Poole and her friends kneeled on the sidewalk, chanting "hands up, don't shoot!" An observer looking eastbound on H Street would have seen this group of protestors engaged in peaceful, constitutionally-protected assembly.



**Figure 3: Peaceful protestors, including Ms. Poole, kneeling and chanting immediately before being shot by law enforcement officials.**

36.    Although the demonstration remained non-violent, law enforcement officers dressed in riot gear and armed with weapons lined up and descended onto the protestors.



**Figure 4: Law enforcement dressed in riot gear descending upon the peaceful protestors depicted in Figure 3.**

37.     The officers marched eastward on H Street, drawing their weapons and firing pepper balls and tear-gas canisters indiscriminately into the peaceful crowd. The weaponry deployed by Defendants caused the peaceful demonstrators, including Ms. Poole, to retreat toward 13th Street.

38.     Ms. Poole attempted to leave the scene, but her movement was restricted as the Defendants Officers and their vehicles blocked points of entry and exit. As she attempted to leave, a gas canister deployed by the Defendant Officers exploded directly in front of Ms. Poole, impairing her vision and further restricting her mobility.

39.     Seconds after the gas canister exploded, a projectile fired by a John Doe Officer struck Ms. Poole in the face. Ms. Poole, who was on the sidewalk at the time, immediately dropped to the ground.

40.      Ms. Poole tasted blood. As she reached for her face to determine the extent of her injuries, she felt her nose hanging near her mouth. With the Defendants Officers still advancing, Ms. Poole relied on her friends to help her up. On the way to the hospital, Elise had to keep pressure on her partially-detached nose to keep it attached to her face.

41.     The projectile fired by the John Doe Officer severed Elise's nose from her face. The severity of these injuries required immediate reconstructive surgery. Doctors determined that the bone, cartilage, and internal valve of her nose was completely destroyed.

42.     Based on the scene as it would have appeared to the officer(s) at the time Ms. Poole was shot, there was no reasonable basis for firing projectiles at or near her or any other individuals gathered on the sidewalk.

43.     Further, upon information and belief, the deployment itself was done in a negligent manner inconsistent with the safe and effective use of such force, and in direct violation of Department policies. In particular, the Defendant Officers did not

safely deploy their weaponry in a manner that minimized and/or avoided projectiles from striking peaceful demonstrators.

44.    Additionally, the Defendant Officers fired the projectiles without any formal training, which is in direct violation of the respective Departments' internal use-of-force policies.

### C. Municipal and Joint Liability.

45.    Lincoln Police Chief Jeffrey Bliemeister and Lancaster County Sheriff Terry Wagner (collectively, "Officials") have sufficiently senior roles such that their decisions may fairly be said to represent official policy of the City of Lincoln and Lancaster County, respectively.

46.    Upon information and belief, the Officials met, discussed, and approved the use of weaponry, including KIPs, rubber bullets, and eXact iMpact Sponge Rounds in advance of the May 31, 2020 demonstrations in Downtown Lincoln.

47.    Sheriff Wagner has since publicly acknowledged his role in authorizing the use of "less lethal" weapons against the crowds of which Ms. Poole was a part, stating that weaponry was used on protestors, in part, because law enforcement officers were "discouraged" by "the constant verbal barrage" they allegedly endured during the demonstrations, because protestors did not have the "proper permitting, and in the alleged interest of protecting property.

48.    All of the foregoing Defendants, including the individual officers present, agreed with and assisted each other to approach the group of peaceful protesters; to use KIPs and other means of "non-lethal" force for the purpose of dispersing the protesters; lent their support and the authority of their office to each other; failed to intervene to prevent the indiscriminate, excessive and unlawful use of KIPs; and advised, assisted, ratified and/or directed the actions and inactions resulting in the severe injuries suffered by Ms. Poole.

49.     The extent of cooperation by and between the different law enforcement agencies and Defendant Officers is reflected in subsequent incident reports. In one report, a Lancaster County Sheriff acknowledges receiving "less lethal" weaponry from the Lincoln Police Department. "I did assist in deploying one canister of OC which I obtained from an LPD officer who was handing them out for deployment," the Sheriff wrote. In another report, a Sheriff acknowledges receiving an "unknown number of beanbag rounds" from an LPD officer, which the Sheriff deployed on demonstrators throughout the evening of May 31, 2020.

50.     In the weeks following the protests, and the severe injuries suffered by Ms. Poole, Officials ratified the use of KIPs and "less lethal" weapons against the crowds. For his part, Sheriff Wagner publicly declared that in a review of his officers' conduct during the protests, including meeting with each deputy involved, he found no instances of excessive force.

51.     Additionally, the Officials received ample notice in advance of the May 31, 2020 protests that LPD officers and Sheriff's Office deputies were indiscriminately using less-lethal force against protestors to control and suppress demonstrations in the absence of any imminent threat to safety, including through widely publicized photos and videos, citizen complaints, and firsthand accounts circulated through the press and social media.

52.     Despite receiving notice, the Officials failed to take action sufficient to remedy the ongoing violations of protestors' constitutional rights by LPD officers and Sheriff's Office deputies, including by failing to train, supervise, or discipline LPD officers or Sheriff's Office deputies or issue corrective policies to prevent further violations.

53.     Instead, the Officials continued to authorize the use of less-lethal force to control demonstrations even while acknowledging that the majority of protestors had been peaceful.

54.     The Officials also acted with deliberate indifference in equipping their officers with "less-lethal" weaponry without proper training and instruction. Indeed, following the protests, Defendant Wagner acknowledged that his officers didn't have

10

the equipment or the training necessary to perform the type of crowd control the Officials ordered. Specifically, Defendant Wagner admitted a "large number [of the deputies involved] had not been trained in crowd control" and lacked even a "basic orientation in crowd control tactics." The unconstitutional consequences of equipping officers with supposed "crowd control" weaponry they do not know how to use is patently obvious.

55.     The Officials acted with deliberate indifference to Plaintiff's constitutional rights by authorizing, both explicitly and implicitly, the indiscriminate use of less-lethal force against protestors who did not pose any safety threat; by failing to properly train officers on the use of "less lethal" weaponry, including rubber bullet projectiles, as a "crowd dispersal" technique; by failing to supervise and discipline LPD officers and Sheriff's Office deputies regarding appropriate use of force against protestors; and by failing to rectify LPD's and Sheriff's Office's unconstitutional custom of using less-lethal force to control and suppress demonstrations.

## FIRST CAUSE OF ACTION

### Violation of the First Amendment / Retaliation – 42 U.S.C. § 1983

56.     Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

57.     Defendants' decision to shoot Ms. Poole with a rubber bullet violates the First Amendment in at least five ways: (i) as unconstitutional retaliation for expressive conduct protected under the First Amendment; (ii) as a violation of the right to peaceably assemble; (iii) as an unconstitutional restriction to a traditional public forum; (iv) as unconstitutional content- and viewpoint -based discrimination; and (v) as a violation of Ms. Poole's right to record matters of public interest.

58.     Defendants have adopted and/or ratified municipal policies, practices, and customs that have caused the violations complained of herein and, in the alternative, have actual or constructive notice of the constitutional violations described herein and have failed to take action, thereby allowing the continuation of such a policy or custom, and causing the harms complained of herein.

11

59.     Ms. Poole's rights to assemble, protest, and demonstrate peaceably are all protected activities under the First Amendment of the United States Constitution.

60.     Defendants, including John Doe Officers 1-21, acted under the color of state law when they deprived Ms. Poole of her rights to assemble, protest, and demonstrate peaceably by shooting her in the face with a rubber bullet.

61.     Defendants' use of force against Ms. Poole and other similarly situated protestors was substantially motivated by the protesters' and Ms. Poole's engagement in First Amendment protected activity, constituted an effort to deter future similar activity, and evidences a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

62.     The above-described conduct was, and continues to be, a proximate cause of Ms. Poole's pain and suffering and has chilled her desire to participate in future protests.

### SECOND CAUSE OF ACTION

### Violation of the Fourth Amendment – 42 U.S.C. § 1983

63.     Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

64.     Ms. Poole did not commit a crime, and was not suspected of committing a crime.

65.     Ms. Poole did not pose a threat to Defendants or any of their officers or agents or any other person.

66.     Ms. Poole was seized by Defendants when Defendants' officers intentionally, by kettling and through the use of force and rubber bullets, terminated her freedom of movement.

67.     Defendants' use of KIPs, rubber bullets, and eXact iMpact Sponge Rounds to effect the seizure was objectively unreasonable and violated Ms. Poole's protections against being unlawfully seized and subjected to excessive force.

68.     Defendants acted under the color of state law when Defendants committed these acts and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

12

69.    Ms. Poole fears further retaliation in the future in violations of the Fourth Amendment if she continues to observe, record, or participate in constitutionally protected activity.

70.    As a direct and proximate result of Defendants" unlawful actions, Ms. Poole endured pain and suffering.

## THIRD CAUSE OF ACTION

### Violation of the Fourteenth Amendment – 42 U.S.C. § 1983

71.    Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

72.    Defendants acted under color of State law when they decided to forcibly disperse Ms. Poole by using rubber bullets, thereby violating her Fourteenth Amendment right to due process.

73.    Ms. Poole has protected First Amendment liberty interests in the right to assemble, protest, and demonstrate peaceably.

74.    Ms. Poole has a right to not be subject to excessive force in the context of engaging in this expressive First Amendment activity.

75.    By violently attacking unarmed protestors engaged in expressive conduct, Defendants have engaged in conduct that was so egregious, so outrageous that it may be fairly be said to shock the contemporary conscience, and therefore that conduct constitutes excessive force in violation of the Due Process Clause of the Fourteenth Amendment.

76.    As a direct and proximate result of Defendants' unlawful actions, Ms. Poole endured pain and suffering.

## FOURTH CAUSE OF ACTION

### Civil Conspiracy – 42 U.S.C. § 1983

77.    Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

78.    On or before May 31, 2020, the Defendant Officers, including the municipal policymakers for both Lancaster County and the City of Lincoln, met to

discuss law enforcement's response to protest activity in and around Lincoln, Nebraska.

79.     The municipal policymakers and John Doe Officers, many of whom were from different law enforcement agencies, reached a mutual understanding to take a course of conduct including, but not limited to, the use of rubber bullets and other weaponry on protestors exercising their First Amendment rights to Free Speech and Assembly.

80.     The municipal policymakers and John Doe Officers reached a mutual understanding to effectuate the kettling, arrest, and detention of protestors exercising their First Amendment rights.

81.     After reaching this consensus, both municipal policymakers directed officers under their control and supervision to execute the unconstitutional activity described above. The John Doe officers joined the conspiracy when they agreed to participate in said activity.

82.     The plan and conspiracy was furthered by overt acts including, but not limited to, the kettling and seizing of Ms. Poole, and the firing of projectiles, including rubber bullets, at peaceful protestors like Ms. Poole.

83.     Subsequent incident reports confirm the Defendants' plan and coordination regarding the indiscriminate use of "less-lethal" weaponry on peaceful demonstrators. In these reports, officers with the Lancaster County Sheriffs' Office acknowledge receiving and deploying "less lethal" weaponry that they received from the Lincoln Police Department.

84.     Defendants acted with discriminatory animus toward the protestors, and against Ms. Poole, intending to deny Ms. Poole and those who associated with the Black Lives Matter movement the equal protection of the law.

85.     As a direct and proximate cause of the conspiracy between the Defendant Officers and others, Ms. Poole was subjected to the deprivation of her First, Fourth, and Fourteenth Amendment rights, and was severely and permanently injured.

**FIFTH CAUSE OF ACTION**

14

**State Law Negligence**

86.     Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

87.     Defendants City of Lincoln and Lancaster County have adopted official Department policies governing the use of force.

88.     Pursuant to these policies, officers are permitted to use "deadly force" only in certain limited circumstances, including to protect deputies or others from threats of death or serious bodily injury. All officers using "deadly force" are required to receive formal training on the specific weaponry used.

89.     "Deadly force" is defined in Department policies as any use of force that creates a substantial risk of causing death **or** serious bodily injury.

90.     The firing or rubber bullets indiscriminately into crowds creates a substantial risk of causing death or serious bodily injury, and thus constitutes "deadly force" under relevant Department policies.

91.     Additionally, manufacturers of KIPs, rubber bullets, and eXact iMpact Sponge Rounds specifically warn law enforcement agencies that such weaponry "may cause serious injury or death to you or others," and thus "must be used only by authorized and trained law enforcement."

92.     At approximately 10:03 pm on the evening of May 31, 2020, John Doe Officers—collectively and in concert with each other—began firing KIPs, rubber bullets, and/or eXact iMpact Sponge Rounds indiscriminately at a peaceful crowd which posed no threat of death or serious injury to the Defendant Officers.

93.     The conduct of these Defendant Officers was inherently dangerous, and conducted in direct violation of Department policies. Accordingly, all officers are alternatively liable for the conduct of each other.

94.     As a direct and proximate cause of this negligent conduct, Ms. Poole sustained severe and permanent injuries to her face, requiring emergency reconstructive surgery.

## **PRAYER FOR RELIEF**

WHERFORE, Plaintiffs respectfully requests an Order as follows:

1. Special damages for the cost of her medical care in an amount to be proven at trial;

2. Compensatory damages for the violations of her constitutional and statutory rights, all to be determined according to proof;

3. Punitive damages;

4. Attorneys' fees pursuant to 42 U.S.C. § 1988;

5. Costs of suit;

6. Pre- and post-judgment interest; and

7. Such other and further relief as the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands trial by jury on all issues so triable.


Dated this 2nd  day of February, 2021.


        Elise Poole and Jackie Buntgen, PLAINTIFFS.

By:    ACLU of Nebraska
134 S. 13th St. #1010
Lincoln, NE 68508
(402) 476-8091
ajsipple@aclunebraska.org


_____
Adam J. Sipple, #20557



and


Daniel J. Gutman, #26039
Jonathan H. Latka, #27123
FRASER STRYKER PC LLO
500 Energy Plaza

16

409 South 17th Street
Omaha, NE 68102
(402) 341-6000
(402) 341-8290- fax
dgutman@fraserstryker.com

ATTORNEYS FOR PLAINTIFFS